BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Thomas P. O'Brien (State Bar No. 166369)
  tobrien@bgrfirm.com
David J. Carroll (State Bar No. 291665)
  dcarroll@bgrfirm.com
801 S. Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808

BROWNE GEORGE ROSS
O'BRIEN ANNAGUEY & ELLIS LLP
Brett D. Katz (to be admitted *pro hac vice*)
  bkatz@bgrfirm.com
5 Penn Plaza, 24th Floor
New York, NY 10001
Telephone: (212) 413-2600
Facsimile: (212) 413-2629

Attorneys for Plaintiffs
Corbel Communications Industries LLC and CCIIP LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORBEL COMMUNICATIONS INDUSTRIES LLC, et al.,<br><br>        Plaintiffs,<br><br>        vs.<br><br>LAT LONG INFRASTRUCTURE, LLC, et al.,<br><br>        Defendants. | Case No. 2:21-cv-08097<br><br>**PLAINTIFFS' *EX PARTE* APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |

**TO THE HONORABLE COURT AND ALL PARTIES:**

    **PLEASE TAKE NOTICE** that Plaintiffs Corbel Communications Industries LLC and CCIIP LLC, will, and hereby do, apply, pursuant to Federal Rule of Civil Procedure Rule 65 and Local Rule 65, for a temporary restraining order:

    1.    Enjoining and restraining Defendants Lat Long Infrastructure LLC, Lat Long Infrastructure of California LLC, Cavallo Capital Partners LLC, Daniel Urban, and their officers, agents, servants, employees, representatives, and all other persons and/or entities conspiring with them or acting in concert with them, from controlling, using, transferring, encumbering, hypothecating, leasing or disposing of Plaintiffs' assets and intellectual property identified in an Asset Purchase Agreement dated June 1, 2021, pending further order of the Court; and

    2.    Enjoining and restraining Defendants Lat Long Infrastructure LLC, Lat Long Infrastructure of California LLC, Cavallo Capital Partners LLC, Daniel Urban, and their officers, agents, servants, employees, representatives, and all other persons and/or entities conspiring with them or acting in concert with them from taking any action to interfere with Corbel's rightful possession and repossession of Corbel's own physical assets as identified herein.

    Plaintiffs further, or in the alternative, seek an order to show cause re: why a preliminary injunction should not issue granting the foregoing relief for the duration of this action.

    This application is based upon this motion, the attached Memorandum of Points and Authorities, the Declarations of Angelo Pino, Patrick Conley, David L. Weissman, and David J. Carroll, and the exhibits thereto, the Table of Exhibits, the Proposed Order, the files, records, and pleadings already on file in this action, and any other evidence or argument that may be presented by Plaintiffs at or before the

1   hearing on this application.

2       Plaintiffs intend to personally serve Defendants Cavallo Capital Partners

3   LLC, Lat Long Infrastructure LLC, Lat Long Infrastructure of California LLC, and

4   Daniel Urban with the Complaint and the instant application for temporary

5   restraining order upon its filing, and will file proof of service with the Court

6   immediately thereafter.

7

8   DATED:  October 11, 2021          BROWNE GEORGE ROSS
                                      O'BRIEN ANNAGUEY & ELLIS LLP
9                                         Thomas P. O'Brien
10                                        David J. Carroll
                                          Brett D. Katz (to be admitted *pro hac vice*)
11

12

13                                By:  _____/s/ David J. Carroll_____
14                                         David J. Carroll
                                  Attorneys for Plaintiffs Corbel Communications
15                                Industries LLC and CCIIP LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................... 3

    A.     The Plaintiffs ................................................................................. 3

    B.     The Asset Purchase Agreement .................................................... 3

        1.     Terms of the Asset Purchase Agreement.......................... 4

    C.     The Closing And Cavallo's Excuses For Nonpayment .................. 5

    D.     Urban and LatLong Nonetheless Refuse to Return Corbel's
        Assets ............................................................................................ 7

III.   LEGAL STANDARD ............................................................................. 9

IV.    ARGUMENT .......................................................................................... 9

    A.     Corbel is Likely to Succeed on its Claims For Trade Secret
        Misappropriation, Breach Of Contract, Conversion, and Trespass ........ 9

        1.     Breach of Contract .......................................................... 10

        2.     Conversion, Trespass to Chattels, and Trespass to Land ........... 11

        3.     Misappropriation of Trade Secrets .................................. 13

            a.     Corbel Owns a Protected Trade Secret ................. 14

            b.     Defendants Misappropriated Corbel's Trade Secrets ...... 15

    B.     Corbel Will Suffer Irreparable Harm If Relief Is Not Granted ........... 16

    C.     The Equities Favor Corbel ........................................................... 18

    D.     The Requested Relief Is In the Public Interest ........................... 19

    E.     The Court Should Exercise Its Discretion Not to Require a Bond ....... 20

V.     CONCLUSION ..................................................................................... 21

Case No. 2:21-cv-08097

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Page</u>**

3

## <u>CASES</u>

4

*Alliance for Wild Rockies v. Cottrell,*

5

 632 F.3d 1127 (9th Cir. 2011) ...................................................................... 9

6

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.,*

7

 750 F.2d 1470 (9th Cir. 1985) ...................................................................... 17

8

*Ashland Oil Co. of Cal. v. Fed. Energy Admin.,*

9

 389 F. Supp. 1119 (C.D. Cal. 1975) ............................................................ 9

10

*BakeMark, LLC v. Navarro,*

 2021 WL 2497934 (C.D. Cal. Apr. 24, 2021) ............................................ 17

11

12

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.,*

 331 F. Supp. 3d 977 (N.D. Cal. 2018) .......................................................... 15

13

*Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.,*

14

 2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) ............................................ 15

15

*Civic Western Corp. v. Zila Industries, Inc.,*

16

 66 Cal. App.3d 1 (1977) ............................................................................... 11

17

*Comet Techs. United States of Am. Inc. v. Beuerman,*

18

 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ........................................... 14

19

*Comet Techs. United States of Am. Inc. v. Beuerman*

20

 (N.D. Cal. Mar. 15, 2018) ............................................................................ 19

21

*Cutera, Inc. v. Lutronic Aesthetics, Inc.,*

 444 F. Supp. 3d 1198 (E.D. Cal. 2020) ....................................................... 17

22

23

*D'Onofrio v. Vacation Publications, Inc.,*

 888 F.3d 197 (5th Cir. 2018) ........................................................................ 11

24

*Doran v. Salem Inn, Inc.,*

25

 422 U.S. 922 (1975) ...................................................................................... 17

26

*Drakes Bay Oyster Co. v. Salazar,*

27

 921 F. Supp. 2d 972 (N.D. Cal. 2013) ......................................................... 17

28

*Express Media Grp., LLC v. Express Corp.*,
  2007 WL 1394163 (N.D. Cal. May 10, 2007) ................................................ 11, 12

*Flip Flop Shops Franchise Co., LLC v. Neb*,
  2016 WL 9275403 (C.D. Cal. Dec. 5, 2016)........................................................ 19

*G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Service, Inc.*,
  958 F.2d 896 (9th Cir. 1992) .............................................................................. 11

*Galaxy Oil Co. v. Ameeti*,
  2021 WL 4047405 (C.D. Cal. Mar. 9, 2021) ....................................................... 12

*Gerber Plumbing Fixtures, LLC v. Amerifreight, Inc.*,
  2015 WL 3824149 (C.D. Cal. June 18, 2015)......................................... 12, 19, 20

*Gizmo Beverages, Inc. v. Park*,
  2017 WL 6940560 (C.D. Cal. Sept. 18, 2017) ..................................................... 19

*Greenstar, LLC v. Heller*,
  814 F. Supp. 2d 444 (D. Del. 2011) .................................................................... 10

*GTAT Corp. v. Fero*,
  2017 WL 7035655 (D. Mont. May 3, 2017) ......................................................... 16

*H.Q. Milton, Inc. v. Webster*,
  2017 WL 5625929 (N.D. Cal. Nov. 22, 2017)...................................................... 18

*Henry Schein, Inc. v. Cook*,
  191 F. Supp. 3d 1072 (N.D. Cal. 2016)................................................................ 19

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013).............................................................................. 18

*Hilson v. Mijares*,
  2021 WL 3578664 (C.D. Cal. Apr. 22, 2021)......................................................... 9

*Intel. Corp. v. Hamidi*,
  30 Cal. 4th 1342 (2003)........................................................................................ 11

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) .............................................................................. 20

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) .................................................................................. 9

*Pac. Rollforming, LLC v. Trakloc Int'l, LLC*,
  2007 WL 3333122 (S.D. Cal. Nov. 7, 2007)........................................................18

*Pimentel v. Dreyfus*,
  670 F.3d 1096 (9th Cir. 2012).................................................................................9

*Posdata Co. v. Kim*,
  2007 WL 1848661 (N.D. Cal. 2007)......................................................................14

*Pyro Spectaculars N., Inc. v. Souza*,
  861 F. Supp. 2d 1079 (E.D. Cal. 2012)..................................................................19

*Reichert v. General Ins. Co.*,
  68 Cal.2d 822 (1968)...............................................................................................10

*Rockwell Collins v. Wallace*,
  2017 WL 5502775 (C.D. Cal. Nov. 10, 2017).......................................................14

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005).................................................................................20

*Solarbridge Techs., Inc. v. Ozkaynak*,
  2012 WL 2150308 (N.D. Cal. June 12, 2012) ......................................................15

*Space Data Corp. v. X*,
  2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017)............................................13

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009).................................................................................19

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
  240 F.3d 832 (9th Cir. 2001)...................................................................................9

*Tex. Woman's Univ. v. Methodist Hosp.*,
  221 S.W.3d 267 (Tex. Ct. App. 2006) ...................................................................11

*UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
  617 F. Supp. 2d 938 (N.D. Cal. 2007)....................................................................15

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 2123560 (N.D. Cal. May 15, 2017) .................................................16, 17

*Welenco, Inc. v. Corbell*,
  126 F. Supp. 3d 1154 (E.D. Cal. 2015)...................................................................11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................... 9

*Wisk Aero LLC v. Archer Aviation Inc.*,
    2021 WL 4073760 (N.D. Cal. Aug. 24, 2021) .............................. 13, 15

**<u>STATUTES</u>**

18 U.S.C. § 1839(3) ............................................................................ 14

18 U.S.C. § 1839(5) ............................................................................ 16

18 U.S.C. §§ 1839(5)(A) and 1839(5)(B) .................................... 13, 14

18 U.S.C. § 3426.1(a) ......................................................................... 15

Cal. Civ. Code § 3336 ........................................................................ 12

Cal. Civ. Code § 3379 ........................................................................ 12

Cal. Civ. Code § 3380 ........................................................................ 12

Cal. Civ. Code § 3426.1(b) ................................................................ 15

Cal. Civ. Code § 3426.1(b)(1) ........................................................... 16

Cal. Civ. Code § 3426.1(d) ................................................................ 14

Cal. Civ. Code § 3426, *et seq.* ................................................... 13, 14

1906440
    -v-
    Case No. 2:21-cv-08097

PLTF CORBEL'S *EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This action arises from a shocking and brazen fraud scheme orchestrated by Plaintiff Corbel Communications Industries LLC's ("Corbel") former Chief Operating Officer, Defendant Daniel Urban, which has now culminated in the theft of $20 million-worth of Corbel's tangible and intangible assets.  This temporary restraining order seeks to enjoin Defendants' ongoing use of those assets and to enjoin them from interfering with Corbel's repossession of those assets.

Defendant Cavallo Capital Partners LLC ("Cavallo") entered into a contract with Corbel to purchase a substantial portion of Corbel's assets for $19,990,697.65.  These assets included Corbel's equipment (which contained its trade secrets), trucks, personnel, intellectual property licenses, and myriad other tangible and non-tangible assets at three locations in California and Texas,[1] which were to be used and operated by Defendants Lat Long Infrastructure LLC and Lat Long Infrastructure of California LLC (collectively "LatLong") – companies controlled by Urban.  Under the contract, Cavallo was required to pay those funds by September 17, 2021.  Not only did Cavallo fail to pay the funds by that date, but Cavallo and LatLong took complete possession and control of the subject assets despite Corbel's protestations that it could not do so until the purchase price was paid.  Cavallo and Urban repeatedly assured Corbel that the funds were in transit, and they even provided Corbel with banking documents purporting to prove that millions of dollars in international wire transfers had already been initiated to fund the deal.

Days turned into weeks without payment.  Almost every day, Cavallo and Urban repeated the mantra that the funds should arrive any day, and that they were simply delayed because these were international wire transfers.  By late September, when the funds *still* had not arrived, it finally became clear to Corbel that this was

---

[1] The physical assets at issue are more specifically identified in the proposed order.

all an elaborate fraud: Cavallo was just an empty shell company; it never funded the deal when it said it did; it had provided fraudulent bank statements to Corbel to induce Corbel to refrain from enforcing its rights; and it had no intention of ever funding the deal.  Corbel repeatedly demanded that Cavallo, LatLong, and Urban cease using its assets and equipment immediately until the funds had been transferred, but they simply refused.

On October 4, 2021, after Corbel threatened litigation, Cavallo admitted to Corbel that it appeared the funds were never transferred.  Cavallo's counsel attempted to conceal its involvement in this fraud, as well as the involvement of LatLong and Urban, by trying to convince Corbel that they were also victims of the fraud, and that Corbel should partner with them in pursuing the supposed investor who walked out on the deal.  Astoundingly, despite these admissions and this entreaty, ***Cavallo and LatLong still will not give up possession of Corbel's assets***. On October 8, 2021, in an apparent attempt to stave off litigation, Cavallo reverted to its empty promise that the funds were in transit and should arrive any day.

Defendants' conduct is utterly devastating Corbel financially and reputationally on a daily basis.  Because none of the contract funds were paid, Corbel is still on the hook for millions of dollars that it owes to its vendors that Cavallo was supposed to directly pay at closing.  Now, without either payment from Cavallo for the assets or any ability to use those assets to generate revenue, Corbel is itself unable to pay these subcontractors and vendors—thus decimating Corbel's reputation among a business community critical to Corbel's operations.  Corbel is already facing collection lawsuits from those subcontractors and vendors, as well as potential eviction from its commercial properties, and it is only a matter of time before Corbel is forced into involuntary bankruptcy.

The harm facing Corbel is irreparable and existential.  Immediate injunctive relief is absolutely critical to salvage what is left of Corbel's operations.  As more detailed in the proposed order, the Court should immediately enjoin and restrain

Cavallo, LatLong, Urban, and any person acting in concert with them from using the tangible and intangible assets that were to be transferred under the contract, and enjoin and restrain them from interfering with Corbel's repossession of those assets.

## II.   FACTUAL BACKGROUND

### A.   The Plaintiffs

Corbel is widely recognized as a leader in the telecommunication and cabling industry, and specifically in the field of microtrenching.  Declaration of Angelo Pino ("Pino Decl.") ¶ 3.  Microtrenching is part of the process used to lay the "last-mile" subsurface fiber optic cables that deliver broadband and other communications technology to businesses and consumers, and has become the preferred method for installing fiber optic cables in cities around the country.  *Id.* ¶¶ 3–6.  Corbel's founder and CEO, Angelo Pino, has nearly 30 years of experience in the telecommunications field and has been on the forefront of the microtrenching market.  *Id.* ¶ 3.

Over the years, Corbel has developed microtrenching methods and techniques that continually exceed industry standards, and it holds several extremely valuable patents, trade secrets, and other protectable business interests in this field.  Pino Decl. ¶ 7.  These include, *inter alia*: (i) multiple patents held by Corbel's affiliate CCIIP LLC; (ii) customer, subcontractor, and vendor pricing information; (iii) concrete restoration product information; (iv) subcontractor database; (v) crew set ups methodologies; and (vi) the general processes and know-how for installing fiber optic cabling using microtrenching.  *Id.* ¶ 20 & n.1.  Corbel has also amassed a significant number of tangible assets, such as tools, computers, specialized equipment for use in microtrenching, and light and heavy-duty motor vehicles.  *Id.* ¶ 8.

### B.   The Asset Purchase Agreement

Around early 2021, while Corbel was exploring possible merger and sale options, Corbel was introduced to Cavallo as an interested purchaser by Corbel's

then-Chief Operating Officer, Urban. *Id.* ¶ 15.  Unbeknownst to Corbel at the time, Urban had already founded the two companies comprising LatLong, which branded itself as a competitor in the microtrenching industry, *id.* ¶ 12—a clear breach of his fiduciary duties.  Because Corbel was unaware of this key fact, Corbel allowed Urban to be its lead negotiator with Cavallo.  Cavallo, in turn, was represented in the transaction by experienced transactional counsel at a highly respected national law firm, Hunton Andrews Kurth LLP, thus giving it a veil of legitimacy. *Id.* ¶ 18.

### 1.   Terms of the Asset Purchase Agreement

On June 1, 2021, Cavallo and Corbel entered into an Asset Purchase Agreement ("APA").  Under the APA, Cavallo would acquire a substantial portion of Corbel's assets, which consisted of some of Corbel's tools, equipment (which contained its trade secrets), vehicles, technology, intellectual property licenses, employees, books and records, and rights to certain contracts and leases.  Pino Decl. Ex. 4 at § 2.1.  Among the leases to be assigned were three real property leases for commercial space leased to Corbel at and 404 Berry Place, Brea, California; 6106 Baldwin Drive, Austin, Texas; and 1303 Rilling Road, San Antonio, Texas.  *Id.* § 2.1(e).  Those facilities also housed a majority of the tangible assets that were to be sold to Cavallo.  Pino Decl. ¶ 39.  Corbel also agreed to provide Cavallo with a four (4) year royalty-free license to use certain of Corbel's intellectual property, including certain patents held by its affiliate CCIIP. *Id.* ¶ 20.  In short, the APA envisioned Cavallo completely taking over Corbel's microtrenching operations in California and Texas.  Only later did Corbel discover that it would actually be LatLong, controlled by Urban, who would take control of the assets from Cavallo.

The parties twice amended the APA, with the Second Amendment to the APA setting the final and full purchase price of all assets at $19,990,697.65.  In the APA, Cavallo represented and warranted that it had "adequate resources to satisfy its obligations hereunder and to operate the Business from and after the Closing Date."

1   Pino Decl. Ex. 4 at § 6.8.[2]

2   Under the APA, the purchase price consisted of four components: (i)

3   $1,131,939.05 in cash due to Corbel on the closing date; (ii) $1,890,697.65 to be

4   paid to Corbel on the closing date as an advance on retainage due an existing

5   contract; (iii) $1,000,000, which Cavallo would pay to a third party as a contract

6   cancellation fee; and (iv) $15,968,060.95 to be paid in the aggregate by Cavallo

7   directly to Corbel's existing creditors.  Pino Decl. Ex. 6 at § 1.1.  The Second

8   Amendment set the closing date as September 17, 2021.  *Id.* at § 1.16.  Pursuant to

9   Section 10.2 of the APA, as amended by the Second Amendment, on or before the

10  closing date, Corbel was required to deliver the necessary assumption and

11  assignment agreements, bills of sale, subleases, and licenses to effectuate a transfer

12  of the sale assets to Cavallo, along with Corbel's books and records.  *Id.* at § 1.15.

13  **C.**   **The Closing And Cavallo's Excuses For Nonpayment**

14  As of the closing date, Corbel was ready, willing, and able to consummate the

15  transaction contemplated by the APA, and delivered all of its closing deliverables.

16  Pino Decl. ¶ 24.  Cavallo, however, failed to deliver any payment at all.  *Id.* ¶ 26.

17  Instead, on the closing date, Corbel was given four wire transfer confirmations

18  purporting to prove payment of a substantial portion of the funds to Corbel and its

19  two main creditors.  Pino Decl. ¶ 26, Exs. 7–10.  Each confirmation is dated

20  September 14, 2021, and ostensibly reflects that the funding party is HK Group, *id.*

21  Exs. 7–10, a stranger to the transaction, which Cavallo has never confirmed as one

22  of its direct or indirect investors.  Two of the wire transfer confirmations, in the

23  combined amount of CHF 8,275,613.64 reflect Corbel as the recipient.  *Id.* Exs. 7–8.

24  The third, in the amount of CHF 1,386,661.67, reflects United Rentals, a Corbel

25

26  [2] In the Second Amendment, Cavallo reserved for itself the right to have
    portions of the purchase price paid by one of Cavallo's direct or indirect investors,
27  rather than by Cavallo itself, Pino Decl. Ex. 6 at § 1.4, which was acceptable to
    Corbel because of Cavallo's representation that it had adequate capital to do the
28  deal, *id.* Ex. 4 at § 6.8.

creditor, as the recipient. *Id.* Ex. 9. The fourth, in the amount of CHF 6,653,268.70, reflects Commercial Credit Group, another of Corbel's creditors, as the intended recipient. *Id.* Ex. 10. Corbel attempted to verify the authenticity of these confirmations and transfers with its bank; however, the bank informed Corbel that the confirmations did not contain sufficient information to confirm that the wires were actually sent and/or to trace the true source of the funds. *Id.* ¶ 28. Corbel's bank repeatedly attempted to obtain from Cavallo and Urban information regarding the purported transfer without success. *Id.* ¶¶ 32–33.

As each day came and went without receipt of funds, Corbel repeatedly inquired with and sought assurances from Defendants regarding the status of the funds. Pino Decl. ¶ 29. Corbel was continually assured that the funds should arrive any day, and that the delays were simply due to the fact that the wires are international wires. *Id.* For example, on September 18, 2021, Cavallo sent a letter to Corbel advising that:

> As you know, these funds are coming from Union Bank of Switzerland which is a major international bank located in Switzerland, and international wires can take several days to clear. So there may be a few days delay before these funds reach your creditors accounts and each bank may handle these matters slightly differently.

*Id.* Ex. 11. On that same day, Cavallo's transactional counsel echoed these same remarks to Corbel's counsel, saying, "As you know, these funds are coming from UBS which is a Swiss bank and international wires can take several days to clear." Declaration of David L. Weissman ("Weissman Decl.") Ex. 16. Days later, on September 20, 2021, Urban again assured Corbel that instructions had been given to the relevant financial institutions to wire funds to Corbel and its creditors, but that international wires could take up to ten days to clear. Pino Decl. ¶ 31. The next day, on September 21, 2021, Urban wrote to Corbel's creditor Union Leasing to advise Union Leasing as to the status of the payment due to it as one of the Pre-Closing Liabilities, and said:

> I had a call with our investor this morning who received an update from

> UBS.  They have indicated that all wires should clear within 48-72 hours.  We offered the execution of the contract so that we could pay funds and have them credited once wires hit as we will have overpaid.  I understand the concerns and I am doing everything I can to get the payments that Corbel owes to you and had hoped this would be an alternative.

*Id.* Ex. 14.  On the same day, in an attempt to placate Corbel, Urban sent Pino a screenshot of a wire transfer confirmation that purports to show an inbound wire to LatLong from one of its investors in the amount of CHF 47,000,000.  *Id.* Ex. 13.  This was intended to convince Corbel that Cavallo had access to sufficient funds to pay the purchase price and that payment would be forthcoming.  *Id.* ¶ 34.

By October 4, 2021, the fraud had become evident.  The wires still had not arrived in either Corbel's account or its creditors' accounts, and was thus clear that no wire transfers had ever been initiated.  That same day, during a telephone call between Corbel's transactional counsel and Cavallo's transactional counsel, Cavallo's counsel finally conceded that Corbel had been defrauded.  In an apparent attempt to disassociate themselves from the fraud scheme, Cavallo's counsel claimed that Cavallo, Urban, and LatLong had also been defrauded by the investor who was originally supposed to fund the APA.  Weissman Decl. ¶ 8.  On October 8, 2021, in an apparent attempt to stave off litigation, Cavallo reverted to its same empty (and demonstrably false) promise that the funds were in transit and should arrive any day.  *Id.* ¶ 9, Ex. 18.

### D.  Urban and LatLong Nonetheless Refuse to Return Corbel's Assets

On the closing date, Corbel's tools, equipment, computers, and vehicles that comprised the Assets were located in warehouses and supply yards located in California and Texas.  Pino Decl. ¶ 39.  Those assets comprise virtually all of the physical assets sold to Cavallo under the APA, and the computer equipment sold contains Corbel's trade secrets.  *Id.* ¶ 20 & n.1.  LatLong and Urban took possession of the assets and have been actively using the assets, along with certain of Corbel's intellectual property, to perform microtrenching work, even though Cavallo has

failed to pay any portion of the purchase price, and Corbel has instructed Cavallo that its assets were not to be used until the APA had been funded.  Weissman Decl. ¶ 6, Ex. 17.  For example, it appears that LatLong is working on a large, city-wide deployment of a fiber optic network in Placentia, California—only seven miles from the Brea location that LatLong has taken over.  *See Construction Commences in Placentia, CA*, SiFi Networks (Jul. 6, 2021), *available at* https://sifinetworks.com/corporate/construction-commences-in-placentia-ca/.

On September 30, 2021, Corbel's litigation counsel sent a letter to Cavallo's counsel demanding that Cavallo and LatLong cease and desist from using any of Corbel's assets unless and until Cavallo satisfies its obligations under the APA, and confirm by October 1, 2021, that they had done so.  Declaration of David J. Carroll ¶ 3, Ex. 22.  Cavallo's counsel did not respond to this letter.  *Id.* ¶ 4.  Corbel also sent an investigator to the Brea, California location with a letter from Corbel demanding the return of its assets.  Declaration of Patrick Conley ¶ 4.  Upon arrival at the Brea location, the investigator observed "LatLong" branding all over the premises, such as a large banner with a "LatLong" logo attached to a chain link fence surrounding the construction yard, *id.* ¶ 5.; and multiple trucks bearing the same "LatLong" emblem, *id.* ¶ 6.  Upon entering the building, the investigator spoke with several LatLong employees about retrieving certain of Corbel's assets, and soon received a call directly from Urban.  *Id.* ¶ 7–9.  Urban informed the investigator that LatLong was not willing to provide him with any assets and instructed him to leave the premises.  *Id.* ¶ 9.

At this point, it is pellucidly clear that Cavallo and LatLong have no intention of voluntarily returning Corbel's assets, even though they have all but admitted that Corbel was defrauded.  *See* Weissman Decl. ¶ 8.  LatLong should not be permitted to reap the fruits of Corbel's assets without having paid for them as this case proceeds, while Corbel faces the imminent loss of its business reputation and good will and faces the threat that its vendors and creditors will lose patience and force

1  Corbel into involuntary bankruptcy.

2  **III.    LEGAL STANDARD**

3          "The purpose of a temporary restraining order is to preserve the status quo

4  pending a fuller hearing." *Hilson v. Mijares*, 2021 WL 3578664, at *1 (C.D. Cal.

5  Apr. 22, 2021) (citation omitted).  The status quo has been defined by the Ninth

6  Circuit as "the last, uncontested status which preceded the pending controversy."

7  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th

8  Cir. 2009) (citations omitted).  "In determining what state of affairs constitute the

9  status quo, [a court] must look to the last peaceable state between the parties which

10 preceded the present controversy." *Ashland Oil Co. of Cal. v. Fed. Energy Admin.*,

11 389 F. Supp. 1119, 1126-27 (C.D. Cal. 1975) (citations omitted).

12         A plaintiff seeking a temporary restraining order must show: (1) a likelihood

13 of success on the merits; (2) that they are likely to suffer irreparable harm in the

14 absence of relief; (3) the balance of equities tip in their favor; and (4) an injunction

15 is in the public's interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

16 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 n.7

17 (9th Cir. 2001) (the same standard for preliminary injunctions applies to temporary

18 restraining orders).  Under the Ninth Circuit's sliding scale approach, a stronger

19 showing of one element may offset a weaker showing of another.  *See Pimentel v.*

20 *Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).

21 **IV.    ARGUMENT**

22      **A.    Corbel is Likely to Succeed on its Claims For Trade Secret
              Misappropriation, Breach Of Contract, Conversion, and Trespass**

23         In order to obtain a temporary restraining order, the movant must establish

24 "serious questions going to the merits." *Alliance for Wild Rockies v. Cottrell*, 632

25 F.3d 1127, 1135 (9th Cir. 2011) (stating that a "serious questions going to the merits

26 and a balance of hardships that tips sharply towards the plaintiffs can support

27 issuance of a preliminary injunction, so long as the plaintiffs also show that there is

28

1  a likelihood of irreparable injury and that the injunction is in the public interest").

2  ### 1.  __Breach of Contract__

3  Corbel asserts a straightforward claim against Cavallo arising from Cavallo's

4  clear breach of the APA.  The APA contemplates claims arising from the agreement

5  to be governed by Delaware law.  Under Delaware law, the elements of a breach of

6  contract claim are: "(1) a contractual obligation; (2) a breach of that obligation by

7  the defendant; and (3) resulting damage to the plaintiffs." *Greenstar, LLC v. Heller*,

8  814 F. Supp. 2d 444, 450 (D. Del. 2011).[3]

9  The facts here unambiguously show a breach of contract.  Section 3.1 of the

10  APA, as amended by 1.4 of the Second Amendment, requires as follows:

11  > The total consideration to be paid by Buyer upon the consummation of
   > the transactions contemplated herein shall be (a) the sum of (i) the Cash

12  > Payment and (ii) the Retainage which are to be paid to the account
   > designated by Seller by wire transfer made pursuant to instructions

13  > given to Union Bank of Switzerland by Cavallo or one of its direct or
   > indirect investors (Seller to provide wire instructions no later than three

14  > (3) days prior to the Closing), (b) payment of the Cancellation Fee
   > Payment by Buyer to SiFi Networks America, LLC and (c) payment by

15  > Buyer of the Pre-Closing Seller Liabilities.

16  Pino Decl. Ex. 6 at § 1.4.

17  The total consideration, as referenced in this section, is equal to the Purchase

18  Price of $19,990,697.65.  Cavallo breached this provision of the APA by not making

19  any payments required by this provision upon consummation of the transaction.

20  Similarly, Section 10.3 of the APA, as amended by Section 1.15 of the

21  Second Amendment, requires in relevant part as follows: "At or before the Closing,

22  Buyer shall deliver to Seller, the following: (a) the Cash Payment . . . ."  Pino Decl.

23  Ex. 6 at § 1.15.  The "Cash Payment" is defined in the Second Amendment as "an

24  amount equal to $1,131,939.05."  *Id.* § 1.1.  Section 10.1 of the APA, as amended

25

26  ---
   [3]    As this is a basic contract claim, both Delaware and California law are
   essentially the same.  Under California law the essential elements of a breach of

27  contract action are "(1) the contract, (2) plaintiff's performance or excuse for
   nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."

28  *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830 (1968).

by Section 1.16 of the Second Amendment, states that the "Closing" is September 17, 2021. *Id.* at § 1.16. Cavallo breached this provision of the APA by not delivering to Corbel the Cash Payment at or before the Closing date of September 17, 2021.

Despite these breaches, Cavallo and LatLong have retained the full benefits of the APA—*i.e.*, they have taken full control and possession of the assets to be transferred under the APA. Thus, they are unequivocally in breach of the APA.

### 2. Conversion, Trespass to Chattels, and Trespass to Land

Corbel also asserts claims for conversion, trespass to chattels, and trespass to land against LatLong and Urban arising from LatLong and Urban's taking and use of Corbel's physical assets in California and Texas. In virtually all states, conversion of property involves the plaintiff's ownership or right to possession of property, and the defendant's wrongful control and disposition of the property. *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Service, Inc.*, 958 F.2d 896, 906 (9th Cir. 1992) (California law); *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 212 (5th Cir. 2018) (Texas law). "It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property." *Express Media Grp., LLC v. Express Corp.*, 2007 WL 1394163, at *4 (N.D. Cal. May 10, 2007) (internal citations omitted).

Trespass to chattels occurs when "an intentional interference with the possession of personal property has proximately caused injury." *Intel. Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350–51 (2003). "A trespasser is liable when the trespass diminishes the condition, quality, or value of personal property." *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1172 (E.D. Cal. 2015). Similarly, "[t]he essence of the cause of action for trespass [to land] is an 'unauthorized entry' onto the land of another." *Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal. App.3d 1, 16 (1977); *see also Tex. Woman's Univ. v. Methodist Hosp.*, 221 S.W.3d 267, 286 (Tex. Ct. App. 2006) (similar for Texas). Plaintiffs are likely to succeed on all three claims.

Corbel is the rightful owner of the tangible and intangible assets that were to be transferred under the APA.  Similarly, Corbel has the right to exclusive possession of the three commercial premises in California and Texas, Pino Decl. Exs. 1–3, which were to be assigned to Cavallo under the APA, *id.* Ex. 4 at sched. 2.1(e).  The physical assets alone, not including the commercial property leases, are valued at in excess of $9,000,000.  *Id.* at sched. 2.1(c).  Without *any* payment from Cavallo under the APA for these assets, there can be no real dispute that Corbel remains the rightful owner of these assets (and the rightful lessee of the properties).

There is also no question that LatLong and Urban are using, possessing, and purporting to exercise exclusive control over Corbel's assets, and purporting to exercise exclusive possession of the premises—even though they concede that they have not paid for it.  This theft and interference is a deliberate and intentional action by LatLong and Urban, who has point-blank refused to surrender possession of the assets to Corbel.  Unless and until the purchase price under the APA is paid, these assets belong to Corbel.  This alone is grounds to find in Corbel's favor.  *See Galaxy Oil Co. v. Ameeti*, 2021 WL 4047405, at *3 (C.D. Cal. Mar. 9, 2021) (finding a likelihood of success on a conversion claim and granting temporary restraining order to return property at issue where defendant admitted having control over plaintiff's property, but refused to return control); *Gerber Plumbing Fixtures, LLC v. Amerifreight, Inc.*, 2015 WL 3824149, at *4 (C.D. Cal. June 18, 2015) (holding likelihood of success on conversion claim where defendant had wrongful possession of $7.6 million in plaintiff's inventory and refused to surrender the inventory).

Finally, the damage to Corbel of Defendants' wrongful disposition of the assets is readily apparent.  The interference with Corbel's possessory right is itself compensable, and includes the right "to specific recovery of the converted property in addition to monetary damages."  *Express Media Grp., LLC v. Express Corp.*, 2007 WL 1394163, at *4 (N.D. Cal. May 10, 2007) (citing Cal. Civ. Code §§ 3336, 3379–80).  Moreover, Corbel currently faces threats from creditors, vendors, and

clients regarding their business operations, which have been put at a standstill due to Defendants' theft.  Pino Decl. ¶¶ 40–41.  Corbel is facing potential involuntary bankruptcy due to their inability to generate revenue using these assets in order to pay off their creditors.  Corbel also has, at great expense, been required to take several actions in pursuit of the stolen assets, including this litigation.  The list goes on and on.  This is all damage that Corbel has suffered and will continue to suffer due to Defendants' theft.

### 3.     Misappropriation of Trade Secrets

Corbel assert two claims sounding in misappropriation: the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1839(5)(A) and 1839(5)(B); and California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, *et seq.*, arising from LatLong's and Urban's misappropriation and wrongful use of Corbel's assets, including its intellectual property.  Both statutes require a plaintiff to show that it possessed a trade secret, that the defendant misappropriated the trade secret, and that the defendant's conduct damaged the plaintiff.  *Space Data Corp. v. X*, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017); *see also Wisk Aero LLC v. Archer Aviation Inc.*, 2021 WL 4073760, at *8 (N.D. Cal. Aug. 24, 2021) ("[C]ourts frequently analyze [the two claims] together.").

Corbel's "Trade Secrets" include its: (a) costing and estimating spreadsheets; (b) presentation documents; (c) financial documents; (d) customer, subcontractor, and vendor pricing information; (e) customer contracts; (f) deployment methods for field staff; (g) leasing and equipment documents; (h) concrete restoration product information; (i) subcontractor database; (j) crew set ups methodologies (size of crews and task breakdowns to make crews productive); (k) blueprints and maps of areas Corbel bid on showing cost projections; and (l) the general processes and know-how for installing fiber optic cabling using microtrenching.  Pino Decl. ¶ 20 & n.1.

### a.   **Corbel Owns a Protected Trade Secret**

Corbel has shown a likelihood of ownership of the trade secrets at issue. Under both the DTSA and CUTSA, a trade secret is information that (1) derives economic value from not being generally known and (2) is subject to reasonable measures of secrecy by its owner.  18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d); *Rockwell Collins v. Wallace*, 2017 WL 5502775, at *2 (C.D. Cal. Nov. 10, 2017).

Under the first prong, Corbel's Trade Secrets have been developed through costly research and experience, cannot be learned by a competitor's simple observation, and cannot be duplicated from public sources.  Corbel has spent millions of dollars, over decades, to develop and acquire these Trade Secrets, which essentially include all aspects of running a microtrenching business from general know how, to pricing information, to customer contacts, and intricate processes and operations to microtrench, to name a few.  Thus, these Trade Secrets offer an actual and further potential economic advantage over others in the niche industry and are critical to Corbel's ability to fairly and successfully compete in the marketplace and, indeed, they have contributed to Corbel's growth and prominence within the market. Pino Decl. ¶ 7.

Under the second prong, to maintain the secrecy over this information, Corbel required that Cavallo enter into a Non-Disclosure Agreement and also included a confidentiality provision in Section 7.4 of the APA.  Pino Decl. Ex. 6; *see, e.g.*, *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) (reasonable efforts included confidentiality agreements); *Posdata Co. v. Kim*, 2007 WL 1848661, at *5 (N.D. Cal. 2007) (finding for TRO purposes that confidentiality agreements and internal security procedures were reasonable measures).  Further, Corbel demanded that Defendants stop using their trade secrets and are now seeking an injunction to halt the disclosure of this information, which further demonstrates efforts to maintain secrecy.

### b. Defendants Misappropriated Corbel's Trade Secrets

With respect to the second element, "[a p]laintiff must show that [a d]efendant acquired, disclosed, or used its trade secrets through improper means." *Solarbridge Techs., Inc. v. Ozkaynak*, 2012 WL 2150308, at *5 (N.D. Cal. June 12, 2012); *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, 2017 WL 1436044, at *4 (N.D. Cal. Apr. 24, 2017) (stating that there are "three theories of liability: (1) acquisition, (2) disclosure, or (3) use").  Improper means are generally understood to include, "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 3426.1(a); Cal. Civ. Code § 3426.1(b).[4]

LatLong and Urban's actions are textbook examples of misappropriation. First, Urban was Corbel's Chief Operating Officer for years prior to the APA transaction, and thus had full access to all of Corbel's Trade Secrets and used and applied those trade secrets in running Corbel's business.  He is aware of their existence, their worth, and the fact that they are confidential.  Yet LatLong and Urban have retained access to this information through improper means – a fraudulent scheme, which began with Urban's self-dealing and ended with theft of the Trade Secrets when the APA was breached and the wires turned out to be fraudulent.  Weissman Decl. ¶ 8.  Those Trade Secrets are available on the very equipment—*e.g.*, the computer equipment—that Urban and LatLong have stolen. The means were clearly improper and this improper (and fraudulent) acquisition is

---

[4] "Misappropriation and misuse can rarely be proved by convincing direct evidence." *Wisk Aero LLC v. Archer Aviation Inc*., 2021 WL 4073760, at *11 (N.D. Cal. Aug. 24, 2021) (citation omitted).  "In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place."  *Id.* (quoting *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984 (N.D. Cal. 2018); *UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) ("Circumstantial evidence is particularly appropriate in trade secret cases.")

1   alone sufficient to find misappropriation.

2       Separately and independently, LatLong's actions also constitute

3   misappropriation because they are actively using Corbel's Trade Secrets despite

4   Corbel's objection. *See* Cal. Civ. Code § 3426.1(b)(1); 18 U.S.C. § 1839(5).

5   LatLong is performing microtrenching services for a client a mere seven miles away

6   from the Brea location, almost certainly using all of Corbel's equipment—which

7   contains Corbel's trade secrets.  It defies logic to assume that a former Corbel

8   executive could perform such complex, engineering-centered work like micro-

9   trenching without using Corbel's trade secrets.  *GTAT Corp. v. Fero,* 2017 WL

10  7035655, at * 1-3 (D. Mont. May 3, 2017) (granting preliminary injunction where

11  plaintiff's former employee and his new company had "detailed . . . engineering

12  information which [defendant] could not have developed on his own in a matter of

13  months without using [plaintiffs] proprietary technology").

14      It would also defy logic that Urban and LatLong would run a competing

15  business with Corbel in secret and attempt to steal Corbel's assets through

16  fraudulent wires—but yet hold their hand in good faith and decide not to use

17  Corbel's Trade Secrets, to which they have ready access.  *See, e.g.*, *Waymo LLC v.*

18  *Uber Techs.*, Inc., 2017 WL 2123560, at *6 (N.D. Cal. May 15, 2017) ("[I]t would

19  strain credulity to imagine that [defendant] plundered [plaintiffs] vault the way he

20  did with no intent to make use of the downloaded trove.").

21      **B.    Corbel Will Suffer Irreparable Harm If Relief Is Not Granted**

22      Corbel faces an imminent threat of catastrophic and irreparable harm if the

23  Court does not intervene.  Corbel is on the precipice of collapse; it owes over $15

24  million to its creditors, which it is unable to pay without at least the use of the very

25  assets that Cavallo and LatLong have stolen.  Corbel's creditors have already started

26  filing collection suits against Corbel, and Corbel faces a very possibility of being

27  driven into involuntary bankruptcy.  Corbel is being forced to pay $500,000 in

28  insurance on assets that *LatLong is using*, as well as rent payments on commercial

property that LatLong is occupying.  Pino Decl. ¶ 43.  An award of money damages to Corbel in two years' time will be of no help; by then, Corbel will be long defunct, which makes the prospect of eventual monetary damages or return of stolen assets at a later date both academic and unhelpful.  Such harm is clearly irreparable.  *See, e.g.*, *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of being driven out of business is sufficient to establish irreparable harm."); *Drakes Bay Oyster Co. v. Salazar*, 921 F. Supp. 2d 972, 994 (N.D. Cal. 2013) (finding irreparable harm where without an injunction, the business would effectively be destroyed); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (the threat of bankruptcy "sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless").

Even aside from this existential threat to its business, a finding of irreparable harm is appropriate where, absent injunctive relief, the defendants have misappropriated the plaintiff's confidential information.  As has been stated, Defendants informed Corbel, despite the fraudulent scheme, that they will not surrender and will continue to use Corbel's assets—which would be in direct competition with Corbel.  This means that Defendants have acquired and, by virtue of this misuse, disclosing Corbel's Trade Secrets, which includes proprietary financial systems, pricing information, client information, and the general processes and know-how for installing fiber optic cabling using microtrenching.  Once the confidential information is improperly disclosed or otherwise misappropriated, it rapidly becomes worthless; it cannot realistically become "un-misappropriated" at a later date.  This, too, constitutes irreparable harm.  *See, e.g.*, *BakeMark, LLC v. Navarro*, 2021 WL 2497934, at *18 (C.D. Cal. Apr. 24, 2021) ("An intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm."); *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1209 (E.D. Cal. 2020) (finding irreparable harm where it appeared defendant would "continue to use the information without

an injunction"); *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017) (noting irreparable harm likely where "it may prove impossible to fully restore the parties to their respective competitive positions as if no misappropriation had occurred" and finding it "far better to . . . put in prophylactic measures now to prevent misappropriation (or further misappropriation)").

Furthermore, Defendants' continued actions also threaten Corbel's relationship and goodwill with its current clients, vendors, and creditors. Corbel owes a substantial amount of money in pre-closing liability—over $15 million—and had committed to paying its creditors and vendors through the APA with Cavallo. Without that payment, or access to the equipment to generate revenue to make those payments, Corbel is losing substantial goodwill with those creditors and vendors on a daily basis. The loss of goodwill is irreparable. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."). This, in turn, will substantially affect Corbel's ability to compete in the marketplace—yet a further irreparable injury. *Pac. Rollforming, LLC v. Trakloc Int'l, LLC*, 2007 WL 3333122, at *3 (S.D. Cal. Nov. 7, 2007) (holding irreparable harm is present where plaintiff suffered injuries of loss of competitive position, loss of sales opportunities, and loss of goodwill in the market because these intangible injuries were not calculable).

### C.   The Equities Favor Corbel

The balance of equities here clearly favors Corbel—and the question is not close. Defendants have stolen $20 million-worth of Corbel's assets. This has decimated Corbel's business reputation in the microtrenching community, and may force Corbel into involuntary bankruptcy. In contrast, Cavallo and LatLong continued to reap the profits and benefits of their unlawful use of those assets. There is not dispute that Cavallo has not paid Corbel for the assets, so there can be no genuine dispute as to the possessory and/or ownership rights to Corbel's assets

that were part of the APA.  Defendants cannot cry hardship where injunctive relief would only prevent them from continuing to break the law.  *H.Q. Milton, Inc. v. Webster*, 2017 WL 5625929, at *5 (N.D. Cal. Nov. 22, 2017) (holding that there was no "significant hardship to defendants" because injunction would only "require them to comply with existing law").  Indeed, California courts consistently find that no hardship befalls a defendant that is prevented from using assets that does not belong to it.  *See, e.g.*, *Comet Techs. United States of Am. Inc. v. Beuerman*, at *5 (N.D. Cal. Mar. 15, 2018) (balance of the equities favors plaintiff where injunctive relief "'would essentially only  require him to abide by existing law regarding the unauthorized use of another's trade secrets'") (quoting *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012)); *Gizmo Beverages, Inc. v. Park*, 2017 WL 6940560, at *7 (C.D. Cal. Sept. 18, 2017) (finding no harm where injunction "merely bar[red] Defendant from infringing on Plaintiff's mark").

As such, the balancing of hardships clearly weighs in favor of Plaintiffs.

### D.   The Requested Relief Is In the Public Interest

Generally, private commercial disputes do not implicate the public interest factor.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (stating "[w]hen the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor . . .'").  But to the extent the public interest is relevant here, it favors Corbel as well. There is unquestionably a public interest in enforcing and upholding contractual obligations; there is a public interest in protecting stolen assets from misuse; there is a public interest in not allowing deceptive business practices.  *See Flip Flop Shops Franchise Co., LLC v. Neb*, 2016 WL 9275403, at *9 (C.D. Cal. Dec. 5, 2016) (it is "generally in the public interest to enforce valid contracts and make parties live up to their agreements."); *Gerber Plumbing Fixtures*, 2015 WL 3824149, at *4 ("the public has an interest in the continued flow of commerce, which does not include locking warehouse doors and auctioning off property clearly belonging to another

1  entity").  Likewise, there is a public interest in protecting a company's trade secrets

2  and confidential information.  *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072,

3  1078 (N.D. Cal. 2016) ("Public interest is also served by enabling the protection of

4  trade secrets.").

5        Therefore, the temporary restraining order, if not neutral due to having no

6  impact on nonparties, is aligned with the public interest.  Corbel satisfies the fourth

7  and final factor in favor of this Court granting their requested relief.

8        **E.**    **The Court Should Exercise Its Discretion Not to Require a Bond**

9        In granting interim relief, the district court has wide discretion in setting the

10  amount of the bond required, if any.  *Johnson v. Couturier*, 572 F.3d 1067, 10886

11  (9th Cir. 2009).  It is well-established that a district court has discretion to dispense

12  with the security requirement, or to require only a nominal security. *Save Our*

13  *Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

14        Here, no bond should be required.  Corbel is seeking interim relief returning

15  to them the assets that are indisputably theirs.  In fact, if Corbel is required to post a

16  bond, the bond essentially would cover restraints on Plaintiffs' *own* assets that were

17  stolen by Defendants.  This would defeat the purpose of rule and would force Corbel

18  to suffer additional harm due to Defendants' misconduct.  *See, e.g.*, *Gerber*

19  *Plumbing Fixtures, LLC*, 2015 WL 3824149, at *5 (declining to require a bond for a

20  TRO requiring defendant to give plaintiff access to its own property).  For those

21  reasons, the Court should use its discretion and not required any bond to be posted.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order enjoining and restraining Cavallo, LatLong, Urban, and those acting on concert with them, from continuing to use and possess Corbel's assets, and enjoining and restraining them from interfering with Corbel's repossession of those assets.

DATED:  October 11, 2021          Respectfully submitted,

                                  BROWNE GEORGE ROSS
                                  O'BRIEN ANNAGUEY & ELLIS LLP
                                      Thomas P. O'Brien
                                      David J. Carroll
                                      Brett Katz (to be admitted *pro hac vice*)


                                  By:  _____/s/ David J. Carroll_____
                                          David J. Carroll
                                  Attorneys for Plaintiffs Corbel Communications
                                  Industries LLC and CCIIP LLC