UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

Present: The Honorable      JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| T. Jackson | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE PLAINTIFFS' *EX PARTE* APPLICATION FOR (1) TEMPORARY RESTRAINING ORDER AND (2) ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION (DKT. 4)**

I.     **Introduction**

On October 11, 2021, Corbel Communications Industries LLC ("Corbel") and CCIIP LLC ("CCIIP") (collectively, "Plaintiffs") brought this action against Lat Long Infrastructure LLC ("Lat Long Infrastructure"); Lat Long Infrastructure of California LLC ("Lat Long CA") (together with Lat Long Infrastructure, "Lat Long"); Cavallo Capital Partners LLC ("Cavallo"); Daniel Urban ("Urban"); and Jeff Anon ("Anon") (collectively, "Defendants"). Dkt. 1. The Complaint advances the following causes of action:

1.    Declaratory judgment, by Corbel against Cavallo;
2.    Breach of asset purchase agreement, by Corbel against Cavallo;
3.    Breach of non-disclosure agreement, by Corbel against Cavallo;
4.    Fraud, by Corbel against all Defendants;
5.    Misappropriation of trade secrets, in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1839(5)(A), (B), by Corbel against all Defendants;
6.    Misappropriation of trade secrets, in violation of the California Uniform Trade Secrets Act ("CUTSA"), by Corbel against all Defendants;
7.    Conversion, by Corbel against all Defendants;
8.    Trespass to chattels, by Corbel against all Defendants;
9.    Trespass to land, by Corbel against all Defendants;
10.   Unjust enrichment, by Corbel against all Defendants;
11.   Breach of employment agreement, by Corbel against Urban;
12.   Breach of fiduciary duty, by Corbel against Urban; and
13.   Patent infringement, by CCIIP against Lat Long and Urban.

*Id.* ¶¶ 125-218.

On October 11, 2021, Plaintiffs filed an "*Ex Parte* Application for (1) Temporary Restraining Order and (2) Order to Show Cause Re: Preliminary Injunction" (the "Application" (Dkt. 4)). The requested relief would enjoin all Defendants, except Anon, from "controlling, using, transferring, encumbering,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

hypothecating, leasing or disposing of Plaintiffs' assets and intellectual property identified in an Asset Purchase Agreement dated June 1, 2021, pending further order of the Court." Dkt. 4 at 2. It would also enjoin all Defendants, except Anon, "from taking any action to interfere with Corbel's right of possession and repossession of Corbel's own physical assets . . ." *Id.*

On October 15, 2021, Defendants filed an opposition to the Application (the "Opposition" (Dkt. 18)). On October 18, 2021, Plaintiffs filed a reply in support of the Application (the "Reply" (Dkt. 19)).

It has been determined that the Application is a matter that can be addressed without a hearing. L. R. 7-15. For the reasons stated in this Order, the Application for the issuance of a temporary restraining order ("TRO") is **DENIED**. The Application for a Preliminary Injunction remains pending and is set for hearing on November 29, 2021; provided, however, that date may be continued as stated below.

On or before November 5, 2021, Plaintiffs shall file a supplemental brief, not to exceed ten pages, that seeks to address the issues raised in this Order. Defendants shall file a supplemental brief in opposition to the Application for a Preliminary Injunction, not to exceed ten pages, on or before November 12, 2021; provided, however, if Plaintiffs elect to conduct discovery prior to the submission of further briefing and Defendants seek any corresponding discovery, on or before November 5, 2021, following a meet and confer process, the parties shall submit a joint report stating their collective and/or respective positions as to a schedule for the completion of such discovery, the filing of supplemental briefs, not to exceed 20 pages each, and a hearing date.

II.    **Factual Background**

       A.    The Parties

The Complaint alleges that Corbel is a New York limited liability company, all of whose members are from New York. Dkt. 1 ¶ 10. It further alleges that "Corbel is a widely[-]recognized leader in the telecommunication and cabling industry, specifically in the field of microtrenching, which is the process used to lay the 'last-mile' subsurface fiber optic cables that deliver broadband and other communications technology to businesses and consumers." *Id.* ¶ 20.

The Complaint alleges that CCIIP is a Delaware limited liability company, all of whose members are from New York. *Id.* ¶ 11.

The Complaint alleges that Lat Long Infrastructure is a Delaware limited liability company, all of whose members are from "Texas, and/or other states that do not include the State of New York." *Id.* ¶ 12.

The Complaint alleges that Lat Long CA is a California limited liability company, with Lat Long Infrastructure as its sole member. *Id.* ¶ 13.

The Complaint alleges that Cavallo is a Delaware limited liability company, and that its sole member is an individual who is a citizen of Texas. *Id.* ¶ 14.

The Complaint alleges that Urban is the manager and sole member of Lat Long Infrastructure and Lat Long CA, and is a citizen of Texas. *Id.* ¶ 15.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

The Complaint alleges that Anon is the manager and sole member of Cavallo, and is a citizen of Texas. *Id.* ¶ 16.

        B.    Factual Allegations

            1.    <u>Microtrenching</u>

Microtrenching is a "method for installing fiber optic cables" that usually involves using "light-duty machinery . . . to dig a narrow trench," within which a conduit is laid that "protects the fiber cables that are ultimately installed" inside it. Dkt. 1 ¶¶ 21-22. The trench is then "backfilled to match the existing road surface." *Id.* ¶ 21.

It is alleged that microtrenching is preferred for use in many cities rather than the use of prior methods of laying subsurface cables. *Id.* ¶ 22. It is alleged that the prior methods require more manpower, are more disruptive and slower than microtrenching, and involve digging "deep trenches for boring under sidewalks, roadways, driveways and other existing structures." *Id.* ¶¶ 21-22, 27. This allegedly makes microtrenching "a lucrative growth market," so there is "high demand within the marketplace for companies with proven track records that can handle large-scale microtrenching projects." *Id.* ¶¶ 22-23.

            2.    <u>Corbel's Alleged Intellectual Property</u>

It is alleged that "Corbel has developed installation methods and techniques that continually exceed and out-perform industry standards, and it holds several extremely valuable patents, trade secrets, and other protectable interests [] that are sought after by many of its competitors and clients." *Id.* ¶ 24. It is specifically alleged that "Corbel, through its affiliate CCIIP, owns a number of valuable patents that streamline the microtrenching process [], which were obtained after Corbel invested substantial time and expense into the research of the methods embodied within the patents and prosecuting the patent applications." *Id.* ¶ 25. These allegedly include United States Patent No. 10,641,414, United States Patent No. 10,571,045, United States Patent No. 10,841,517, United States Patent No. 10,781,942 and United States Patent No. 10,883,629. *Id.* ¶¶ 26, 29, 32, 35, 38. It is alleged that, with respect to each of these patents, "CCIIP is the assignee and owner of all rights, title, and interest." *Id.* ¶¶ 28, 31, 34, 37, 40. It is also alleged that Corbel's founder and CEO Angelo Pino ("Pino") is identified with Urban as a co-inventor of these patents. *Id.* ¶¶ 20, 41.

It is further alleged that Corbel has the following information that constitutes trade secrets:

      (a) costing and estimating spreadsheets; (b) presentation documents; (c) financial documents; (d) customer, subcontractor, and vendor pricing information; (e) customer contracts; (f) deployment methods for field staff; (g) leasing and equipment documents; (h) concrete restoration product information; (i) subcontractor database; (j) crew set ups methodologies (size of crews and task breakdowns to make crews productive); (k) blueprints and maps of areas Corbel bid on showing cost projections; and (l) the general processes and know-how for installing fiber optic cabling using microtrenching.

*Id.* ¶ 42.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

      3.    <u>Corbel's Physical Assets</u>

It is alleged that Corbel owns physical assets, including tools, computers, specialized equipment for microtrenching, and light- and heavy-duty motor vehicles, which are collectively valued at more than $9,000,000. *Id.* ¶ 44. It is further alleged that Corbel owns "substantial additional [p]hysical [a]ssets" that are "subject to third party encumbrances." *Id.*

      4.    <u>Daniel Urban</u>

It is alleged that Urban was employed by Corbel from 2016 to August 31, 2021. *Id.* ¶ 46. His most recent role at Corbel is alleged to have been chief operating officer ("COO"). *Id.*

It is alleged that Urban executed an employment agreement with Corbel ("Employment Agreement") on March 16, 2018, that included non-disclosure, non-competition and non-solicitation clauses. *Id.* ¶ 47. The latter two provisions allegedly restricted Urban's ability to compete with Corbel for one year following the termination of his employment there. *Id.*

It is alleged that, while employed by Corbel, Urban founded Lat Long Infrastructure in March 2020, and Lat Long CA in February 2021. *Id.* ¶ 48. It is alleged that "Lat[ ]Long describes itself" on its website as a "'full-service telecommunications installation organization that specializes in building telecommunications networks throughout the United States and beyond'" and that offers microtrenching. *Id.* It is further alleged that, since founding Lat Long, "Urban has entered into contracts on behalf of Lat[ ]Long for the provision of microtrenching services competitive with the same services offered by Corbel." *Id.* ¶ 49. One such contract is alleged to be with Corbel client SiFi Networks America ("SiFi"). *Id.* ¶¶ 49-50.

It is alleged that Lat Long is charging a higher rate than Corbel for similar work, and is able to do so because it is using Corbel's intellectual property. *Id.* ¶ 50.

      5.    <u>The SiFi Fullerton Project</u>

It is alleged that in 2018 Corbel entered into an agreement with SiFi ("SiFi Agreement") for Corbel to undertake a ten-city microtrenching project ("SiFi Project"), the first phase of which was for the City of Fullerton, California ("Fullerton Phase") to be completed by July 2021. *Id.* ¶¶ 51-53. It is alleged that "Corbel was required to deliver to SiFi a performance and payment bond equal to 100% of the full value of the Fullerton Phase to secure full performance of the work to be performed by Corbel." *Id.* ¶ 52. It is alleged that Corbel thereafter obtained a bond of $30,255,961.08 ("Fullerton Bond") and delivered it to SiFi on April 12, 2019. *Id.*

It is alleged that Urban and his brother, Josh Auerbach ("Auerbach"), who oversaw the Fullerton Phase as Corbel's Director of Field Operation for the West Region, "continually devoted far more resources into the Fullerton Phase than was needed, . . . which exponentially increased Corbel's costs for the SiFi Project, and significantly reduced the chance to realize any profit from the Fullerton Phase." *Id.* ¶¶ 54, 58.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

It is alleged that, "[i]mmediately after delivering the Fullerton Bond, the Fullerton Phase became plagued by problems and delays," and that as result, "by early 2021, Corbel estimated that the Fullerton Phase was behind schedule by approximately 330 days, which pushed" the estimated completion date to June 2022. *Id.* ¶¶ 55, 57. It is alleged that "Urban knew that these delays created a risk to Corbel that SiFi would attempt to call upon" the Fullerton Bond, yet he "steadfastly resisted any request by Corbel's CEO to send change orders to and/or negotiate concessions with SiFi," including "increas[ing] payment due on the Fullerton Phase," "reduc[ing] the amount of the Fullerton Bond, or negotiat[ing] an exit from [the SiFi Agreement] and hav[ing] the Fullerton Bond discharged entirely." *Id.* ¶¶ 60-62. Urban's alleged motivation in resisting any efforts by Corbel to address the problems with the Fullerton Phase was that he sought SiFi's founder to invest in Lat Long, and for SiFi to become a client of Lat Long. It is also alleged that, by not remedying the problems, he could sabotage the Fullerton Phase for Corbel and obtain the remainder of the project for Lat Long. *Id.* ¶ 63.

6.     The Asset Purchase Agreement

It is alleged that the economic pressure stemming from the Fullerton Phase caused Corbel to initiate "negotiations with third parties to discuss possible merger and sales options." *Id.* ¶ 64. One such third party was Cavallo, "which had been introduced to Corbel by Urban." *Id.*

Cavallo allegedly expressed "interest[] in purchasing a substantial portion of Corbel's assets in California and Texas" but lacked "the requisite knowledge or experience to actually operate a microtrenching business." *Id.* ¶¶ 65-66. Thus, it allegedly would require an experienced partner to operate any microtrenching business. *Id.* ¶ 66. It is further alleged that, "until that partner could be found, Corbel's CEO and President would act as board advisors to Cavallo, and Cavallo would hire Urban to assist in the transition." *Id.*

It is alleged that, "[u]nbeknownst to Corbel at the time, Cavallo already had its operations partner in Urban and his company, Lat[ ]Long, which had already begun operating as a competing microtrenching business, and was, upon information and belief, in discussions with SiFi to take over the work on the SiFi Project if and when Corbel exited the project." *Id.* ¶ 67. It is further alleged that, unaware Urban "was the *de facto* owner and alter-ego of Cavallo and [Lat Long]," "Corbel allowed Urban to be its lead negotiator with Cavallo." *Id.* ¶ 68.

It is alleged that, by June 1, 2021, Corbel and Cavallo had entered into an asset purchase agreement ("Asset Purchase Agreement" or "APA") for Cavallo to acquire Corbel's assets for $17,100,000. *Id.* ¶ 70. The APA allegedly was executed by Anon on behalf of Cavallo. *Id.* ¶ 71.

It is alleged that, "[s]imultaneously with the negotiation of the APA, Corbel also entered into negotiations with SiFi concerning the assignment of the agreement governing the SiFi Project [] to Cavallo." *Id.* ¶ 72.

It is alleged that Corbel discovered that Urban owned Lat Long and "intended to be Cavallo's operating partner" only after the APA had been executed and negotiations with SiFi to assign the SiFi Project to Cavallo had begun. *Id.* ¶ 76.

It is alleged that the APA was amended on June 30, 2021 ("First Amendment to the APA") and again on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

August 31, 2021 ("Second Amendment to the APA"). *Id.* ¶ 77.

It is alleged that the APA, as amended, provided that, for $19,990,697.65 ("Purchase Price"), Cavallo was to purchase, and Corbel to sell, all right, title and interest in Corbel's physical assets and intellectual property, as well as "rights to certain contracts and leases" (collectively, "Corbel Assets"). *Id.* ¶¶ 78, 80. It is also alleged that, under the APA, Corbel was to provide Cavallo with a four-year royalty-free license to use certain of Corbel's intellectual property, including its patents. *Id.* ¶ 79.

It is alleged that SiFi "would not allow the SiFi Agreement to be assigned to Cavallo." *Id.* ¶ 83. Instead, SiFi allegedly "would (i) permit Corbel to terminate the SiFi Agreement if Corbel paid to SiFi a $1,000,000 exit fee ("SiFi Cancellation Fee") and (ii) reduce the Fullerton Bond to $10,000,000 if Corbel warrants the work performed on the Fullerton Phase for a period of one year after Lat[ ]Long, with whom SiFi intended to sign a new agreement, completes work on the Fullerton Phase." *Id.*

       7.   <u>Closing of the APA</u>

It is alleged that the Purchase Price had the following four components:

> (i) $1,131,939.05 in cash due to Corbel ("Cash Payment"), (ii) $1,890,697.65 to be paid to Corbel as an advance on the retainage due to Corbel upon termination of the SiFi Agreement ("Retainage"), (iii) $1,000,000, which Cavallo would pay to SiFi in full satisfaction of the SiFi Cancellation Fee [] if Cavallo and SiFi executed an agreement for microtrenching work, and (iv) $15,968,060.95 to be paid in the aggregate by Cavallo directly to Corbel's existing creditors ("Pre-Closing Liabilities") to address any existing liabilities on Corbel's balance sheet as of the [c]losing [d]ate [("Closing Date")].

*Id.* ¶ 85. The Closing Date allegedly was to be June 30, 2021, but was extended twice, first to July 15, 2021, and then to September 17, 2021. *Id.* ¶¶ 89-90.

It is alleged that, as of the Closing Date, Corbel was obligated under the APA to deliver "the necessary assumption and assignment agreements, bills of sale, subleases, and licenses to effectuate a transfer of the [Corbel] Assets to Cavallo, along with Corbel's books and records" (collectively, "Corbel's Closing Deliverables"). *Id.* ¶ 86. It is alleged that, as of the Closing Date, "Cavallo was obligated to deliver copies of the necessary assumption and assignment agreements, bills of sale, subleases, and licenses to effectuate a transfer of the [Corbel] Assets to Cavallo." *Id.* ¶ 87. By the Closing Date, Cavallo allegedly "was required to pay (i) the combined sum of the Cash Payment and Retainage to Corbel, (ii) the Pre-Closing Liabilities to Corbel's creditors, and (iii) the [SiFi] Cancellation Fee to SiFi." *Id.* ¶ 88.

It is alleged that, "[a]s of the Closing Date, Corbel was ready, willing, and able to consummate the transaction, and delivered all of [its] Closing Deliverables, which should have been held in escrow pending Corbel's receipt of the Cash Payment and Retainage, and confirmation from Corbel's creditors that the Pre-Closing Liabilities were satisfied." *Id.* ¶ 91. It is further alleged that "Cavallo . . . failed to pay any of the Cash Payment, Retainage, or Pre-Closing Liabilities." *Id.* ¶ 92.

It is alleged that Corbel's creditors to whom payment to satisfy the Pre-Closing Liabilities is owed ("Creditors") were assured by Cavallo's attorneys that payment would be timely. *Id.* ¶ 93. It is further

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

alleged that, because the Creditors have not been paid in satisfaction of the Pre-Closing Liabilities, Corbel risks being "force[d] . . . into an involuntary bankruptcy." *Id.* ¶ ¶ 94-95.

8.   <u>Alleged Wire Transfers by Cavallo</u>

It is alleged that Cavallo falsely represented itself in the APA as having "'adequate resources to satisfy its obligations'" under the APA "'and to operate [Corbel] from and after the Closing Date,'" when in fact "Cavallo is undercapitalized and was formed by Urban and Anon only as a straw buyer for Lat[ ]Long" to buy Corbel's assets. *Id.* ¶¶ 96-97.

It is alleged that, although Corbel has not yet been paid under the APA, "Urban claims that Cavallo complied with the requirements of the APA, and forwarded to Corbel, on or about September 17, four wire transfer confirmations," which show that the "sending party is HK Group, an unknown stranger to the transaction," and are dated September 14, 2021. *Id.* ¶¶ 98-99. It is further alleged that two of these purported wire confirmations show that Corbel is the intended recipient, and each of the others shows that one of Corbel's creditors is the intended recipient. *Id.* ¶ 100. It is further alleged that none of them "contains sufficient information for Corbel's financial institutions to confirm that the wires were sent and/or trace the funds." *Id.* ¶ 101.

It is alleged that "Urban has continually assured Corbel that the funds should arrive any day." *Id.* ¶ 102. For example, on September 18, 2021, Cavallo allegedly told Corbel that "'these funds are coming from Union Bank of Switzerland [("UBS")]. . . , and international wires can take several days to clear,'" a statement that was reiterated by Cavallo's transactional counsel in a message to Corbel's transactional counsel the same day. *Id.* ¶¶ 103-04.

It is alleged that, on September 20, 2021, "Urban . . . assured Corbel's CEO that instructions had been given to the relevant financial institutions to wire funds to Corbel and its creditors, but international wires could take up to ten days to clear." *Id.* ¶ 105. Corbel allegedly asked "that Urban provide it with SWIFT wire confirmation numbers so that Corbel's bank could try to trace and confirm the wires," but "Urban advised that the could not provide any such information." *Id.* ¶ 106.

It is alleged that, on September 21, 2021, Urban advised Corbel's creditor Union Leasing, to which payment was due "as one of the Pre-Closing Liabilities Payments," that UBS "ha[d] indicated that all wires should clear within 48-72 hours.'" *Id.* ¶ 107. On the same day, Urban allegedly "sent to Corbel's CEO, via text message, a screenshot of a wire transfer confirmation that purports to show an inbound wire to Lat[ ]Long from HK Group in the amount of CHF 47,000,000." *Id.* ¶ 108.

9.   <u>Alleged Use of Corbel's Assets by Cavallo</u>

It is alleged that, "[s]ince Lat[ ]Long's inception, Urban, without authorization from Corbel, has, upon information and belief, used Corbel's" physical assets and intellectual property "to perform microtrenching work in direct competition with Corbel," which was possible because "the location of Corbel's tools, equipment, and vehicles were known by and accessible to Urban as a result of Urban's position as COO of Corbel." *Id.* ¶¶ 110-11. In addition, Urban allegedly "has significant knowledge of and access to Corbel's" intellectual property. *Id.* ¶ 112.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

It is further alleged that, since the Closing Date, Lat Long has taken possession of and used Corbel's physical assets that "were located in warehouses and supply yards located in California and Texas," and has been "actively using" its intellectual property, including its patents, despite not having paid "any portion of the Purchase Price." *Id.* ¶¶ 113-15; *see also id.* ¶¶ 116-18.

It is alleged that, "[o]n September 30, 2021, Corbel's litigation counsel sent a letter to counsel for Cavallo and Lat[ ]Long, demanding that Cavallo and Lat[ ]Long cease using all of Corbel's equipment, assets, and intellectual property, including Corbel's [p]atents," and received no response. *Id.* ¶ 119. On the same date, agents for Corbel allegedly "attempted to retrieve certain of its [p]hysical [a]ssets, including laptop computers[,] from an office and supply yard in California that is leased to Corbel, that Lat[ ]Long ha[d] converted for its own use," but those agents were not permitted to do so. *Id.* ¶¶ 120-21.

It is alleged that Lat Long has continued to use Corbel's physical assets and intellectual property. *Id.* ¶¶ 119, 122.

It is alleged that, "[o]n October 4, 2021, Cavallo's counsel conceded to Corbel's transactional counsel that Corbel had been defrauded" but "claimed that Cavallo, Urban, and Lat[ ]Long had also been defrauded by the investor who was originally supposed to fund the APA." *Id.* ¶ 123. It is further alleged that, "despite conceding the APA was a sham," "Cavallo's counsel did not agree that Cavallo and Lat[ ]Long would cease use of Corbel's [p]hysical [a]ssets" and intellectual property. *Id.* ¶ 124.

**III.    Analysis**

      A.    Legal Standards

A temporary restraining order preserves the status quo until there is an opportunity to hold a hearing on a preliminary injunction. 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2951 (3d ed. Apr. 2020); *see Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) (Temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."). The legal standards for a TRO and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). Instead, in determining whether to grant such relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

To warrant the issuance of a TRO, the moving party must establish: (1) it is likely to succeed on the merits of its underlying claims; (2) it is likely to suffer irreparable harm unless the requested injunctive relief is granted immediately; (3) the balance of the equities between the parties tips in its favor; and (4) an injunction is in the public interest. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). Likelihood of success on the merits is the "threshold inquiry" and "the most important factor" in determining whether interim, injunctive relief is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

warranted. *Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020) (citing *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019)). If the moving party fails to show a likelihood of success on the merits, the court "need not consider the remaining three [*Winter* elements]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (alteration in original) (citing *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)).

Alternatively, where a plaintiff establishes "serious questions going to the merits," and demonstrates "a balance of hardships that tips sharply towards the plaintiff," a preliminary injunction is warranted "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell* ("*Cottrell*"), 632 F.3d 1127, 1135 (9th Cir. 2011). *Cottrell* determined that this "serious questions" test, which requires a lesser showing as to success on the merits than the "likelihood of success" test, continues to apply following *Winter* when two conditions are met. *First*, the balancing of the equities must tip "sharply" in favor of movant. *Id. Second*, the other *Winter* factors – irreparable harm and the public interest – must be established. See *Farris v. Seabrook*, 677 F.3d 858, 864-65 (9th Cir. 2012) (clarifying *Cottrell* test).

    B.    Application

        1.    <u>Irreparable Harm</u>

            a)    Legal Standards

"[A] plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202-03 (9th Cir. 1980)). To carry this burden, a plaintiff also must "demonstrate that irreparable injury is *likely*," and not just possible, "in the absence of an injunction." *Winter*, 555 U.S. at 22; *Cottrell*, 632 F.3d at 1131. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

To warrant injunctive relief, irreparable injury must also be imminent. *See Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011); *De Vico v. United States Bank,* No. CV 12-08440 MMM (FFMx), 2012 U.S. Dist. LEXIS 155622, at *20 (C.D. Cal. Oct. 29, 2012). "[E]stablishing a threat of irreparable harm in the indefinite future is not enough." *Amylin*, 456 F. App'x 676 at 679.

That imminent, irreparable harm is likely must be established through "probative evidence." *De Vico*, 2012 U.S. Dist. LEXIS 155622, at *21. "[C]onclusory" affidavits "without sufficient support in facts" do not pass muster. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (affidavits from plaintiff corporation's "own executives delineating" harm were insufficient to support a finding of irreparable injury).

            b)    Application

                (1)    <u>Loss of Business Reputation and Good Will</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

Plaintiffs argue that Defendants' conduct "threaten[s] Corbel's relationship and goodwill with its current clients, vendors, and creditors." Dkt. 4 at 26. They further assert that, "Corbel owes a substantial amount of money in pre-closing liability—over $15 million—and had committed to paying its creditors and vendors through the APA with Cavallo." *Id.* Thus, "[w]ithout that payment, or access to the equipment to generate revenue to make those payments, Corbel is losing substantial goodwill with those creditors and vendors on a daily basis," which is "irreparable." *Id.*

While generally "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award," in some cases "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (citing *Los Angeles Memorial Coliseum Comm'n*, 634 F.2d at 1202; *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519-20 (9th Cir. 1984)). "Federal courts embrace a conception of goodwill that extends beyond customers to include employees, suppliers, and creditors." *WMX Techs. v. Miller*, 80 F.3d 1315, 1326 n.5 (9th Cir. 1996) (citations omitted) (Hawkins, J., concurring in part and dissenting in part).

Damage to reputation and loss of goodwill primarily have been recognized as an irreparable harm in the trademark infringement context. *See Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 (citing *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-38 (2d Cir. 1995)) (in trademark infringement context, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm"); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239 (9th Cir. 2013) (citing *Stuhlbarg*, 240 F.3d at 841) (same); *Adidas Am., Inc. v. Skechers USA, Inc.,* 890 F.3d 747, 768 (9th Cir. 2018) (citing *Rent-A-Center*, 944 F.2d at 603) (finding "harm to [plaintiff's] reputation and goodwill" in the trademark infringement context).

These claimed injuries have also been the basis for a finding of irreparable harm in connection with breach-of-contract claims. *See Rent-A-Center*, 944 F.2d at 603 (affirming a finding of irreparable harm where breach of contract would cause likely injury to a company's "advertising efforts and goodwill"); *Bernie's Pharm., Inc. v. Amerisourcebergen Drug Corp.*, No. 3:18-cv-00183-TMB, 2018 U.S. Dist. LEXIS 229852, at *19 (D. Alaska Aug. 24, 2018) (plaintiff pharmacy Bernie's demonstrated irreparable harm by showing that the defendant's breach of contract "would likely drive Bernie's out of business, and at a minimum, would damage Bernie's reputation as [it] had to turn away numerous patients"); *see also Cant Strip Corp. v. Schuller Int'l*, No. 93-15425, 1994 U.S. App. LEXIS 24390, at *6 (9th Cir. Sep. 1, 1994) (district court did not clearly err in considering "irreparable harm to [the plaintiff's] goodwill" in "balance of hardships" analysis on claim for breach of contract).

To carry its burden of demonstrating irreparable harm to warrant preliminary injunctive relief, Plaintiff must provide evidence of such harm to its reputation or goodwill. *See Herb Reed Enters.*, 736 F.3d at 1250-51; *Dreamer Enters. v. Hankook Trading, Inc.*, No. CV 14-4704-JFW (Ex), 2014 U.S. Dist. LEXIS 194690, at *4 (C.D. Cal. Aug. 20, 2014) ("Other than monetary damages, Plaintiff only makes conclusory statements, without adequate evidentiary support, that Defendant's conduct will put it out of business and that it will suffer damage to its reputation."). A court's finding of irreparable harm must not be "grounded in platitudes rather than evidence." *Herb Reed Enters.*, 736 F.3d at 1250.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

Corbel has supported its assertion that it faces likely irreparable harm to its reputation by providing the following evidence:

> (i) a copy of the summons, complaint and related filings in *Sunbelt Rentals, Inc. v. Corbel. Communications Industries, LLC*, No. 8:21-cv-1460 (C.D. Cal. filed Sept. 7, 2021) (the "*Sunbelt* Action"), which is attached as Exhibit 23 to the Declaration of Angelo Pino in support of the Reply (the "Reply Pino Declaration") (Dkt. 19-2); (ii) a copy of the summons and complaint in *Rexford Industrial Berry, LLC v. Corbel Communication Industries of California Inc., et al.*, No. 30-2021-01223268-GU-UD-CJC (Cal. Sup. Ct. filed Sept. 17, 2021) (the "*Rexford* Action"), which is attached as Exhibit 24 to the Reply Pino Declaration (Dkt. 19-3); and (iii) a copy of two letters, dated October 12 and 14, 2021 and addressed to Corbel Communications Industries LLC from counsel for Patriot Environmental Services, Inc. (the "Patriot Letters"), which is attached as Exhibit 25 to the Reply Pino Decl. (Dkt. 19-4).

The complaint in the *Sunbelt* Action, which was filed on September 7, 2021, alleges that Sunbelt Rentals, Inc. ("Sunbelt") rented equipment to Corbel between August 2020 and June 2021, that Corbel "failed to pay the rental charges," and that, "as of June 2021, the total unpaid principal amount . . . was $195,597.79." Dkt. 19-2 at 8-9. The complaint in the *Rexford* Action, which was filed on September 17, 2021, alleges that Corbel contracted to rent the premises at 404 Berry Place, Brea, CA 92821 (the "Brea Premises") on September 30, 2020 for $66,524.33 per month. Dkt. 19-3 at 6-7. It alleges that Corbel was served with "[n]otice to pay rent or quit" on September 14, 2021 because one month's rent in the amount of $66,524.33 was past due. *Id.* at 7-9. Rexford Industrial Berry, LLC ("Rexford") is alleged to be the landlord of the Brea Premises. *Id.* at 6.

The filings from the *Sunbelt* and *Rexford* Actions do not sufficiently support a finding of irreparable harm. There must be a "'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined," although "a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823 (9th Cir. 2018) (citing *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011); *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)). Both the *Sunbelt* and *Rexford* Actions were filed on or before the Closing Date, and the latter action, which was filed on the Closing Date, had been initiated before that date, as Rexford had sent a "[n]otice to pay rent or quit" on September 14, 2021, as to rent that was delinquent as of September 8, 2021. *See* Dkt. 19-3 at 7-8, 36. That both the *Sunbelt* and the *Rexford* Actions were filed on or before the Closing Date does not sufficiently show that Defendants' alleged breach of the APA after the Closing Date was the cause of either Corbel's financial distress or the resulting loss of goodwill and/or reputational damage that Plaintiff alleges. Plaintiffs argue that Corbel will suffer "the loss of its business reputation and good will as a result of Cavallo's failure to pay Corbel's creditors as required by the APA." Dkt. 19 at 11. The timing of the *Sunbelt* and *Rexford* Actions appears to show that Corbel was unable to pay its creditors, and as a result those creditors brought litigation, on or before the Closing Date. *See also* Declaration of Daniel Urban ("Urban Decl." (Dkt. 18-3)) ¶¶ 3-5. Any alleged harm to Corbel's reputation resulting from its inability to pay its debts or being sued by creditors is not sufficiently linked by the present evidence to Defendants' alleged breach, which occurred after the Closing Date.

The analysis is different as to the Patriot Letters. The first of the Patriot Letters provides support for finding such a causal connection. This letter, which is dated October 12, 2021 (the "October 12 Letter"),

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

states that "Corbel contracted with Patriot [Environmental Services, Inc. ("Patriot")] in writing in May 2020 for personnel, equipment and services for non-hazardous mud removal in Orange County, California," and "Corbel has failed to timely pay Patriot" for these services. Dkt. 19-4 at 4. As of October 12, the Letter asserted that Corbel owed Patriot "the principal amount of $260,361.00." *Id.* That the October 12 Letter was sent a few weeks after Defendants' alleged breach provides some evidence to support the claim that Defendants' breach did cause, at least in part, Corbel's inability to pay its creditors. The Letter does not state when the amount owed became past due.

The October 12 Letter suggests Corbel's inability to pay creditors has the potential to harm its reputation. Its tone reflects Patriot's growing frustrating with Corbel for failing to pay its bills. It further establishes a high probability that Corbel's continued inability to pay its debt to Patriot will lead to litigation. It "demands that Corbel (or its attorneys) promptly contact [counsel for Patriot] to coordinate payment," and states that failure to do so by October 22, 2021 will cause Patriot to file litigation against Corbel. *Id.* This shows that, at the time of Plaintiffs' filing of the Application, there was a significant likelihood that at least one of Corbel's creditors would commence litigation. Given that litigation is filed publicly, further litigation against Corbel by its creditors threatens further damage to Corbel's reputation.

Although the October 12 Letter provides some evidence that Corbel faces likely imminent harm in the form of reputational damage or loss of goodwill, Plaintiffs have not established that Corbel is "likely to suffer irreparable harm *in the absence of preliminary relief*." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (emphasis added) (citing *All. for the Wild Rockies*, 632 F.3d at 1131). Plaintiffs have failed to show that the requested injunctive relief would prevent the irreparable harm they have established as likely. *See Oakley v. DeVos*, No. 20-cv-03215-YGR, 2020 U.S. Dist. LEXIS 106092, at *40-41 (N.D. Cal. June 17, 2020) (citations omitted) ("Plaintiffs . . . must show that the threatened harm would not occur if an injunction is granted."); *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 AHM (SHx), 2010 U.S. Dist. LEXIS 145449, at *41 (C.D. Cal. July 30, 2010) (the plaintiff "has failed to establish that it will suffer irreparable harm in the absence of preliminary relief" where "[n]othing indicates that injunctive relief against [the defendant] will help to alleviate" the alleged harm), *aff'd*, 653 F.3d 976, 982 (9th Cir. 2011).

If granted, the TRO that Plaintiffs seek would result in the re-transfer to Corbel of its physical assets. *See* Dkt. 4 at 2. Other than a few references to "us[ing] [Corbel's physical] assets to generate revenue," *see id.* at 10, 21, 26, Plaintiffs have not asserted that Corbel, if it repossesses those physical assets, will have any opportunity of using them to generate revenue, including revenue at a pace and in an amount to allow Corbel to pay off its significant debts before its other creditors commence litigation causing further alleged damage to its reputation.

Using microtrenching equipment to generate revenue requires paying clients, and Corbel has assigned its contracts with clients SiFi and Google Fiber to Cavallo pursuant to the Agreement. *See* Schedule 2.1(d) to the APA, Dkt. 4-9 at 61; Dkt. 1 ¶¶ 86, 91. SiFi is the only Corbel client specifically named in the Complaint, and Google Fiber is referred to by Defendants as "one of Corbel's biggest clients." Dkt. 18 at 14. The relief requested by Plaintiffs does not include the reassignment of any contracts from Cavallo to Corbel, and Plaintiffs have not asserted that Corbel has remaining contracts with any other clients. Without further evidence, this suggests that, having assigned to Cavallo its contracts with SiFi and Google Fiber, Corbel will not have significant immediate opportunities to use its equipment to generate revenue. Moreover, even if Corbel could sell its equipment should Corbel repossess it, Pino

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

states that the value of the physical assets that "Corbel owns free and clear" is over $9,000,000. However, the Pre-Closing Liabilities payment in the APA suggests that Corbel owes its creditors approximately $15,968,060.95. Declaration of Angelo Pino ("Pino Decl." (Dkt. 4-1)) ¶¶ 8, 22. Assuming Corbel could capture the full value of its assets by selling them, it still would be unable to satisfy over six million dollars of debt. There is not presently sufficient evidence as to why the ability to pay some of its debts would not continue to cause alleged loss of goodwill or damage to reputation. In light of the present evidence, it has not been adequately shown that the requested TRO is warranted.

Finally, the evidence does not sufficiently address whether Corbel, having agreed to liquidate most of its physical assets under the APA, intended to return to, or remain in, business following the Closing Date. If it did not intend to do either, or does not intend to do so now, Corbel has not sufficiently shown that damage to its reputation or loss of goodwill is an irreparable harm warranting extraordinary injunctive relief. *Cf. Kaanapali Tours, LLC v. Haw. Dep't of Land & Nat. Res.*, No. CIVIL 11-00555 LEK-RLP, 2012 U.S. Dist. LEXIS 11204, at *27 (D. Haw. Jan. 31, 2012) (no showing of irreparable harm where "Plaintiff . . . has not been in active operation and therefore it arguably does not have goodwill and reputation to lose if it is forced to go out of business").

If Corbel did not intend to continue operating as a business, or later determine to do so as a result of the alleged breach, then harm to its reputation may not be cognizable. This question is deferred for further consideration in connection with the pending Application for Preliminary Injunction.

(2)    Involuntary Bankruptcy

Plaintiffs argue that Corbel faces irreparable harm in the absence of injunctive relief due to the threat of "involuntary bankruptcy." Dkt. 4 at 10, 17, 21, 24, 26. Although bankruptcy in general may qualify as an irreparable harm, *see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975), to warrant injunctive relief bankruptcy must be imminent. The present evidence has not shown this.

Plaintiffs have provided two forms of evidence to support this theory of irreparable harm. The first is a statement by Pino that "creditors . . . will force Corbel into an involuntary bankruptcy." Pino Decl. ¶ 40. This is not enough to support their theory. *See Lag Shot LLC v. Facebook, Inc.*, No. 21-cv-01495-JST, 2021 U.S. Dist. LEXIS 122542, at *30 (N.D. Cal. June 25, 2021) (citing *AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*, No. 19-cv-04789-PJH, 2019 U.S. Dist. LEXIS 139303, 2019 WL 3859012, at *5 (N.D. Cal. Aug. 16, 2019)) ("[M]ere assertions that a plaintiff 'may' go out of business are insufficient.").

The second consists of the court filings in the *Sunbelt* and *Rexford* Actions showing that Corbel's creditors have commenced claims against it to collect debts owed by Corbel. *See* Exs. 23-24 to Reply, Dkts. 19-2, 19-3. This showing does not satisfy the requirement that irreparable harm be imminent. Plaintiffs' theory appears to be that litigation against Corbel by its creditors will result in money judgments, which will cause Corbel to enter bankruptcy. As noted, the purpose of granting a temporary restraining order is preventing a likely harm from occurring before a hearing on a preliminary injunction can take place. Given the usual pace of litigation, it has not been shown that final judgments in the pending actions, or some interim relief, would be entered before the preliminary injunction is considered.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

Additionally, there is not a sufficient causal connection between Defendants' alleged breach of the APA and the threat to Corbel of involuntary bankruptcy. Urban states that Corbel's current financial difficulties and significant debt began long before Defendants' alleged breach. Urban Decl. ¶¶ 4-5. This is consistent with the allegations in the Complaint as to the "economic pressures" on Corbel and its "negotiations with third parties to discuss possible merger and sales options." Dkt. 1 ¶ 64. That the APA includes $15,968,060.95 in "Pre-Closing Liabilities" "to be paid in the aggregate by Cavallo directly to Corbel's existing creditors, *id.* ¶ 85, also implies that Corbel was experiencing financial difficulties before Defendants' alleged conduct.

*Perfect 10* is instructive. In that case, the plaintiff's "theory of irreparable harm" was that the defendant's conduct "ha[d] both destroyed its business model and threatened it with financial ruin." *Perfect 10*, 653 F.3d at 981. The plaintiff supported this theory with declarations by its "founder, president, and major financial backer," who discussed how the company's declining revenues had "push[ed] [it] 'very close to bankruptcy.'" *Id. Perfect 10* held that the plaintiff "ha[d] not shown a sufficient causal connection between irreparable harm to [its] business" and the defendant's conduct, finding that the plaintiff "ha[d] not established that the requested injunction would forestall that fate [of bankruptcy]" and "ha[d] not alleged that it was ever in sound financial shape." *Id.* at 981-82.

Plaintiffs here have not alleged that Corbel was "in sound financial shape" prior to Defendants' alleged breach. In addition, they have not established that the TRO would prevent involuntary bankruptcy. Plaintiffs seek a TRO that would restrain Defendants "from taking any action to interfere with Corbel's rightful possession and repossession of Corbel's own physical assets." Dkt. 4 at 2. If the TRO were granted and Plaintiffs were able to repossess their physical assets, Plaintiffs have neither asserted, nor provided sufficient evidence to suggest, that Corbel would be able to satisfy the debts it currently owes. As noted, Plaintiffs suggest that Corbel's equipment could be used "to generate revenue to make" the payments Corbel owes to its creditors, *see id.* at 26, but Corbel has not demonstrated on the present record that it would have an actual opportunity to use its equipment to generate revenue were its physical assets returned.

Under the terms of the APA, Corbel was to transfer to Cavallo "all of [its] rights and interests in the Contracts listed on Schedule 2.1(d)," which are the "Assigned Contracts." APA ¶ 2.1, Dkt. 4-9 at 14. Schedule 2.1(d) appears to include the contract for the SiFi Project. *See* APA Schedule 2.1(d), Dkt. 4-9 at 61 ("Customer Contracts" include "Framework Master Agreement for Professional Engineering Services, Procurement, and/or Construction dated June 15, 2018 between Seller and SiFi Networks America, LLC including Exhibit B, the Fullerton Work Order."). The Agreement provides that "[t]he Assigned Contracts comprise all of the Contracts material to the Business." APA ¶ 5.13, Dkt. 4-9 at 20. Although the Agreement contemplates that Corbel will retain "all Contracts and other assets . . . other than the Assets" as defined by the Agreement, *id.* ¶ 2.3(b), Dkt. 4-9 at 15, Plaintiffs have not shown whether Corbel has retained any "Customer Contracts" that would provide a near-term opportunity for Corbel to use its physical assets to generate revenue.

(3)    Misappropriation of Trade Secrets

Plaintiffs argue that misappropriation of its trade secrets is a likely irreparable harm. Dkt. 4 at 25.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

As a threshold matter, Plaintiffs have not provided adequate factual support for their contention that the information possessed by Defendants includes trade secrets, although Defendants have not disputed this premise of Plaintiffs' misappropriation claims. Under the DTSA, "[a] 'trade secret' is information that (1) derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable by other people who can obtain economic value from its disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845-846 (N.D. Cal. 2019) (citing 18 U.S.C. § 1839(3)). Similarly, the CUTSA defines a trade secret as information that (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d).

As to the requirement that a trade secret be one that has been subject to reasonable efforts to maintain its secrecy, Plaintiffs have alleged only that Urban's employment contract prohibits him from using and disclosing Corbel's trade secret information, and that the APA prohibits either party from disclosing the other's trade secrets. *See* Dkt. 1 ¶¶ 47, 73; Dkt. 4 at 22; Dkt. 19 at 10-11. They have not alleged that they have engaged in further efforts to maintain the secrecy of the information they claim to be trade secret.

Plaintiffs have not alleged adequate facts to show that Corbel owns trade secret information. Although reasonable efforts to maintain secrecy have been found to include "requiring employees to sign nondisclosure agreements, *see CHR Holdings, Inc. v. Carroll*, No. CV 15-01875-BRO (DTBx), 2016 U.S. Dist. LEXIS 183978, at *23 (C.D. Cal. Mar. 15, 2016) (alterations in original) (citing *Cinebase Software, Inc. v. Media Guar. Trust, Inc.*, No. C98-1100 FMS, 1998 U.S. Dist. LEXIS 15007, *27 (N.D. Cal. Sept. 22, 1998)); *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993), Plaintiffs have cited no authority that requiring only one employee out of hundreds to sign an NDA constitutes such reasonable efforts. Urban states that there were at least 224 employees at Corbel who were integrated into Lat Long, and he "was the only employee at Corbel with [a non-disclosure agreement] and non-compete agreement in place, and . . . Corbel did not require the same for any other employee . . . ." Urban Decl. ¶¶ 2, 16. Plaintiffs do not dispute this, instead arguing that Corbel was not obligated to have "*every* employee . . . sign a [non-disclosure agreement] to warrant trade secret protection." Dkt. 19 at 10. Although a showing of reasonable efforts to maintain secrecy does not necessarily require that every employee be subject to a non-disclosure agreement, it plainly requires more than demonstrating that just one employee out of more than 200 employees was precluded from sharing information that is now alleged to be trade secret. *See Woodall v. Walt Disney Co.*, No. CV 20-3772-CBM-(Ex), 2021 U.S. Dist. LEXIS 190332, at *13-14 (C.D. Cal. Aug. 5, 2021) (citing *KEMA, Inc. v. Koperwhats*, No. C 09-1587 MMC, 2010 U.S. Dist. LEXIS 90803, at *4 (N.D. Cal. Sept. 1, 2010)) ("Courts have found trade secret claims fail as a matter of law where the trade secret owner fails to obtain a non-disclosure agreement from persons receiving the purported trade secret information."). Thus, if such an agreement is necessary as to only one employee to ensure protection of the information, evidence to support this position should be presented.

Because Plaintiffs have not demonstrated that Corbel owns trade secrets, they cannot show that misappropriation of trade secrets is an irreparable harm.

*          *          *

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV 21-08097 JAK (Ex) | Date | October 29, 2021 |
|---|---|---|---|
| Title | Corbel Communications Industries LLC, et al. v. Lat Long Infrastructure LLC, et al. | | |

Plaintiffs have not shown that they will face irreparable harm in the absence of a temporary restraining order. It is therefore unnecessary to address the remaining *Winter* elements. *See Herb Reed Enters.*, 736 F.3d at 1251 ("In light of our determination that the record fails to support a finding of likely irreparable harm, we need not address the balance of equities and public interest factors."); *Franchising v. Starcycle Franchise*, No. CV 19-9911-DMG (KSx), 2020 U.S. Dist. LEXIS 122181, at *14 (C.D. Cal. Mar. 27, 2020) ("Because StarCycle has not satisfied the irreparable harm requirement, the Court need not address the remaining components of the preliminary injunction analysis.").

**IV.    Conclusion**

For the reasons stated in this Order, the Application is **DENIED** as to the request for a TRO. This determination is without prejudice to the consideration of the Application for a Preliminary Injunction based on the submission of additional evidence and corresponding supplemental briefing as stated above.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer      mr